IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| CRYSTAL SHELL, | ] |
| Plaintiff, | ] |
| v. | ] No. 2:22-CV- |
| PARKDALE MILLS, INCORPORATED, | ] |
| Defendant. | ] |

**COMPLAINT**

Plaintiff Crystal Shell files her complaint for damages and relief for the defendant's retaliatorily and discriminatorily discharging her because she pursued a Tennessee Workers' Compensation claim for medical benefits and avers:

1. This Court has authority to hear the plaintiff's state law retaliatory discharge claims by virtue of its diversity of citizenship jurisdiction, codified at *29 U.S.C. §1332*. The plaintiff's state law retaliatory discharge claims are premised upon the provisions of *T.C.A. §50-6-114* and Tennessee common law.

2. Plaintiff Crystal Shell filed her first federal court Complaint against the defendant for its retaliatorily discharging her for have made a worker's compensation claim for medical benefits on April 4, 2019 in the United States District Court for the Eastern District of Tennessee No. 2:19-cv-0005. The

1

Complaint was served upon the defendant within 90 days as would have been required under the Tennessee Rules of Civil Procedure had the plaintiff filed her complaint in a state court. The parties conducted written discovery and were preparing for additional discovery when the plaintiff's counsel became seriously ill with Covid-19.

3. Unable to meet the Court's scheduling deadlines, the plaintiff, with the agreement of the defendant, filed a motion and stipulation to dismiss without prejudice as to the plaintiff's state law claims on February 9, 2021. The Plaintiff avers that the Tennessee savings statute permits the plaintiff to re-file her state law retaliatory discharge claims against the plaintiff.

4. Plaintiff Crystal Shell is a 30-year-old white female. She is a resident of Johnson County, Tennessee. At the times pertinent to her claims for a retaliatory discharge, Ms. Shell was employed by defendant Parkdale Mills. The plaintiff is a resident of the state of Tennessee for purposes of this Court's diversity of citizenship jurisdiction.

5. Parkdale Mills, Incorporated, is a privately held corporation with headquarters located at 531 Cotton Blossom Circle, Gastonia, N.C. 28054-5245. Parkdale Mills owns and operates twenty-four plants in various states and is currently producing more than 3,500,000 pounds of yarn weekly. The company employs more than 3000 individuals. The defendant company owns and operates

a combed cotton yarn manufacturing facility in Mountain City, Tennessee. Parkdale Mills purchased the Mountain City textile factory in 2009. The defendant's registered agent is listed by the Tennessee Secretary of State's Office as the C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546. The defendant is a citizen of the state of North Carolina for purposes of this Court's diversity of citizenship jurisdiction.

6. The plaintiff was originally assigned to training on the defendant's Marzoli Spinning frames. Because of her apparent allergy to the polyester fiber utilized to make thread the Marzoli frames, the plaintiff was moved to training on the defendant's Heather spinning frames as a ring spinner.

7. While working one of the defendant's spinning machines on April 5, 2018, the plaintiff suffered a foot injury when she struck and injured her left foot on an air compressor valve which protruded 3-4 inches from the machine near floor level. The defendant's managing agents refused to furnish her with any medical treatment despite her repeated requests for worker's compensation medical treatment for her painfully injured foot.

8. On Monday April 9, 2018, supervisors assigned the plaintiff to a lighter duty job of cleaning tufts out of spinning machines. While the plaintiff was was walking between two spinning frames, she stepped on a floor air vent whose cover guard had been left unsecured. The vent cover moved off the vent and the

3

plaintiff fell into the open air vent.

9. As a result of her on-the-job fall into the air vent, the plaintiff injured her right leg. Plaintiff Shell plaintiff filled out an accident report in the defendant's break room and sat in pain on a break room chair until the defendant sent her home for the remainder of the day. None of the defendant's managers or supervisors arranged for the plaintiff to taken to any health care provider for examination or treatment of her leg injuries. By the next day, the plaintiff's right leg had swelled to one and a half times its original size.

10. Ms. Shell attempted to work the day after the work accident with her swollen leg. Her boyfriend helped her walk into the defendant's factory. The Plaintiff began losing feeling on the back of her right leg. The plaintiff's increasing leg pain prevented her from doing any productive work. The plaintiff's injured leg began to turn blue.

11. The plaintiff talked with the defendant's Human Resources Manager Faye Thompson and asked for medical treatment for her injured leg. HR Manager Thomson told Ms. Shell that she, Thompson, would determine if the plaintiff needed to see a doctor. Ms. Thompson announced that there was nothing wrong with the plaintiff's leg. Thompson told Ms. Shell she was just "a little bruised" and should go back to work.

12. Supervisor Pardue assigned the plaintiff to sit in the office and put

4

labels on empty cones. The plaintiff told the company supervisors how badly her injured leg hurt and asked each of them if she could be sent to a doctor for treatment. The supervisors insisted that the plaintiff was "O.K." and refused to furnish her any medical treatmen.

13. On Wednesday, April 11, 2018, the plaintiff stayed home and put ice packs on her legs. Ms. Shell did not have any medical insurance and could not afford to pay for a doctor to examine and treat her injured leg.

14. On April 12, the plaintiff' boyfriend drove her to work. Ms. Shell "hopped" into the defendant's factory. She again asked supervisor Pardue for the company to send her to a doctor. Pardue responded: "No - you're walking." Ms. Shell had to sit on the floor in pain taking thread off the frames' bobbins. Her right leg was now bruised and black.

15. Desperate for medical treatment, the plaintiff asked supervisor John Hammett if she could please be sent to a doctor for her injured leg. Hammett told the plaintiff to talk to "Faye" - the defendant's HR manager. The plaintiff again talked to HR Manager Thompson and requested that the company send her to see a doctor on workers' compensation. Thompson said again: "No. You're fine."

16. On Friday, April 13, the plaintiff again asked supervisor Pardue to be sent to a worker's compensation physician. Pardue replied snidely: "You're

5

not better yet?" The plaintiff insisted that "no, I am not better," that she had fallen down a hole at work and needed to see a doctor. Ms. Shell told supervisor Pardue that she needed to go to a doctor under the company's workers' compensation insurance because her medical insurance did not "kick-in" until April 17.

17. The plaintiff explained that she could not put her weight on her right leg without becoming nauseated by the pain. Supervisor Pardue responded that the plaintiff was "walking fine." Instead of furnishing the plaintiff with medical treatment as required by the Tennessee Workers' Compensation statutes, the defendant insisted the plaintiff do her regular "ring spinner" work as a "floater."

18. In continuing pain and completely frustrated by the defendant's refusing to furnish her with medical treatment for her work injury while insisting instead that she work with a severely bruised and swollen leg, the plaintiff asked HR Manager Thomson for a copy of the workers' compensation accident report so she could take it to Dr. Thompson, a local physician utilized by the company for worker's compensation injuries. Thompson refused the plaintiff's request and stated that she would not give the plaintiff a worker's compensation accident report. Thompson insisted that the plaintiff was "fine."

19. The plaintiff suffered through her weekend off-days with continuing leg pain. Still badly bruised, Ms. Shell returned to work on Monday,

6

April 16, 2018. Supervisor Pardue assigned the plaintiff to work the spinning frames as a floater. Pardue again ignored the plaintiff's plea that she needed to see a doctor.

20. The plaintiff talked again to HR Manager Thompson and asked for a copy of the on-the-job injury accident report so she could see a doctor. Thompson replied that she had lost it. Later during the work day, supervisor Pardue approached the plaintiff and advised her that the company was "letting her go" because her "90-day probation period was up" and she wasn't able to run her machines.

21. The defendant's announced reason for suddenly discharging the plaintiff was pretextual. Before her painful and debilitating leg injury, the defendant's supervisors and trainers had complimented the plaintiff's performance. None of the defendant's supervisors or trainers told the plaintiff that she was in danger of being discharged over any performance issues. The plaintiff certainly could not run any spinning machines during the week preceding her discharge because of her on-the-job injury.

22. After she was illegally and retaliatorily discharged, the plaintiff contacted Tennessee Department of Labors' Worker's Compensation East Tennessee offices on April 17 and described the defendant's continued refusal to provide her with medical treatment after her on-the-job injury. Apparently. the

Tennessee worker's compensation representatives contacted the defendant's Human Resources Manager and reminded the defendant of its statutory obligations to provide the plaintiff with medical treatment for her on-the-job leg injury.

23. HR Manager Thompson telephoned the plaintiff and arranged to meet her at the Johnson County Community Hospital Emergency Room. Thompson told Ms. Shell that she had not been fired because of her on-the-job accident. The Emergency Room physician examined the plaintiff and told her and Ms. Thompson that the plaintiff should be off work for two weeks. The doctor prescribed pain medication and anti-inflammatory medication for the plaintiff.

24. Despite being reminded of its statutory worker's compensation obligations, the defendant did not offer to reinstate the plaintiff after it had retaliatorily discharged her.

25. Under Tennessee law as explained by the Tennessee Supreme Court in *Clanton v. Cain-Sloan,* 677 S.W.2d 441 (Tenn.1984), an employer's discharging an employee because that employee has made a claim for worker's compensation benefits, is a prohibited "device" under *T.C.A. §50-6-114* which ostensibly allows an employer to deliberately avoid paying workers' compensation benefits. At *677 S.W.2d 445*, the *Clanton* decision concluded that a legal cause of action was impliedly created by the Tennessee worker's compensation statutory scheme to secure the rights of the injured employee and to fulfill the intention of

the state legislature.

26. Plaintiff Shell avers that when she repeatedly notified the defendant's supervisors and HR Manager during the week of April 9, 2018 that she had injured her right leg on the job and needed medical attention, she triggered the affirmative obligation on defendant Parkdale's part under the Tennessee workers' compensation statutes to furnish her with whatever medical treatment she might reasonably require, free of charge, [*T.C.A. §50-6-204(a)(1)*], and to furnish her with a list of three or more physicians from which she could choose to receive treatment. [*T.C.A. § 50-6-204(a)(4)*]. Plaintiff Shell repeatedly insisted that she was entitled to medical treatment under the company's worker's compensation insurance.

27. The circumstances of the plaintiff's on-the-job injury and her repeated requests to the defendant's supervisors and to Parkdale's HR Manager for workers' compensation medical treatment constitute a claim for workers' compensation benefits which supports her retaliatory discharge claim. *Elliot v. Blakeford at Green Hills, 2000 WL 1817228, 17, IER Cases 129 (Tenn. App. 2000) at pages *4-*6* and *Whirlpool Corp. v. Pratt, 2008 WL 4615709, 28 IER cases 523 (Tenn. App. 2008) at page *4-*5*.

28. The plaintiff avers that her making repeated claims for workers' compensation medical treatment was a substantial motivating factor in the

9

defendant's discharging her. The defendant's repeated refusals to furnish her with the medical treatment to which she was entitled to under Tennessee Workers' Compensation statutes was deliberate, willful, malicious, in bad faith, and intentional. The defendant's retaliatorily discharging the plaintiff was willful, malicious, in bad faith, and was intended to punish her and retaliate against her for asserting her state law rights to make a claim for workers' compensation medical benefits.

29. As a result of the defendant's retaliatory discharge, the plaintiff has sustained lost wages and will continue to lose wages in the future. She has suffered mental distress, embarrassment, and anxiety. The defendant's earning capacity has been impaired and her enjoyment of life has been diminished. The plaintiff is entitled to awards of compensatory damages and punitive damages from the defendant under Tennessee law.

WHEREFORE THE PLAINTIFF DEMANDS:

1. Judgment against the defendant for an award of compensatory damages in the amount of at least $1,000,000.00.

2. Judgment against the defendant for an award of punitive damages in the amount of at least $1,000,000.00.

4. A jury to try her legal claims.

5. Such other relief as will make the plaintiff whole.

Respectfully Submitted,

s/ C. R. DeVault, Jr.
CHARLTON R. DEVAULT, JR.
TN BPR #000428
102 Broad Street
Kingsport, TN 37660
(423) 246-3601

ATTORNEY FOR THE PLAINTIFF